May it please the Court, I'm Malcolm Wheeler. I represent Ford Motor Co. This is a case in which the District Court turned both punitive damages law and due process on its head. The Court began by excluding from the jury's consideration I think we need to stop the clock running. Go ahead. Thank you, Your Honor. You got a free opening. Thank you. The Court began by excluding from the jury's consideration a piece of information that the Supreme Court has repeatedly held to be one of the most important considerations in determining the allowable amount of punitive damages, and yet the District Court not only allowed into evidence net worth. There are two ways in which to read what the Supreme Court has said, and one of them is that this is something that is measured by which the jury needs to make a determination. I mean the other way of reading it is to simply say that the jury makes a determination on whatever basis, and then we use that as a benchmark for cutting down the punitive award if it exceeds a certain multiple of that figure. So it's not fair to me that the Supreme Court has told us that this has to be presented to the jury, the actual damage award. Now normally, of course, the jury would know. That's point number one, that not only normally the jury would know, but virtually in every instance with the possible exception of one that I will probably get to this morning, the jury will know or the finder of fact in a bench trial would know. But more importantly, Your Honor, although it's at least conceivable to read State Farm that way since the court did not address that precise distinction, it would make no logical sense and certainly I would think no juridical sense to have a situation in which the rules of the game that are applied on appeal are different from the rules of the game that the players think that they're playing by. Why are they different? There's a construct that seems to have arisen where the jury is told, this is what Judge Graber's dissent in your first round, you're paying the price of your victory. You've got to go back, but you've got to go back in front of a different jury. But in her view anyway, and I understand the majority didn't address it, but in her view, as long as the jury understands the constraints and gets the idea that it isn't supposed to run hog wild, that's sufficient that then the trial judge and then the appellate court can take a look at it. Now whether that's a sensible construct or not, I don't know, but that seems to be the procedural construct. So this is a somewhat unusual case, so I'm just wondering, well, what would the jury have done if they had been told a precise dollar amount of what the plaintiffs had gotten on the compensatory side? What would they know what the first jury did to come up with that number? I will answer that question, Your Honor. May I first say that I believe that Your Honor's premise, although accurately stating Judge Graber's dissent, there is no question that the United States Supreme Court in state form rejected Judge Graber's view. Oh, I don't know. You may think not or think so, but I don't find any precise rejection of that. The reason I say that is because the context of Judge Graber's argument in dissent or contentions in dissent was that no jury instruction, no additional jury instruction was required, that that was not constitutionally required, but the court, the Supreme Court, in fact, in state form, made it clear that at least an extraterritoriality instruction is, in fact, constitutionally required. That was given here. I understand, but I'm simply saying the same argument that Judge Graber was making there applies here. Namely, we now know that where there is an important constitutional question at stake, that a jury instruction on that is required, as it should have been given in this case on this point. Now, are you talking about they should have been told what the amount was? Exactly. Based on, like, a reasonable relationship? Exactly. And you're saying that's been clearly held by state form? I'm saying that the analogy is clear and that that- That doesn't answer my question, though. Let's suppose that the jury in this case, normally, as Judge Kozinski pointed out, the jury is going to be the same jury, so they'll know. They're not going to have to be told what the amount was. So the question is, does the second jury get anything more out of the instruction if the dollar amount is put on it than being told that the claim is for fully compensated? It absolutely does, Your Honor. Because now you're going to argue that the jury has to be instructed that it can't award damages under some theory of multiples? Is that your understanding of what state form is? It is not quite. The argument is that the jury is entitled to, and we're entitled to have the jury know so that we can argue two things. One, that the jury ought to take into consideration proportionality between the compensatory award and the penal award. And second, that as in Memphis School District, we are entitled to tell the jury that compensatory awards provide at least some measure of deterrence and punishment, and that the jury should take that into consideration. How would they know that, though? It wouldn't, and it doesn't have to. So you're saying that if the jury knew that Ford had had to cough up $2 million, that that somehow would have caused them to reevaluate? So if the first jury awarded $500, that you would have been happy then to have that amount put before the jury? Absolutely. That's exactly right. I mean, again, it's a question of whether the jury should be allowed to consider it and whether we should be allowed to argue it to make it clear to the jury. What are the principles of retribution? What are the principles of deterrence? And as the Supreme Court made especially clear in State Farm, the whole concern with not providing guidance to the jury as to what the principles are is that they come in in a vacuum. They don't know what it means to say you are to punish and deter. And we need to give them some idea of what the principles are. Now, you're saying that the jury should be instructed on the concept of proportionality, they should be told specifically that the punitive damage award should somewhat be proportional to some extent for the jury to determine based upon the compensatory damages. I don't know whether that's part of any charge on punitive damages that I've read. Actually, it is in some jurisdictions, Your Honor. But yes, I'm saying that the jury needs to be told that there has to be reasonable proportionality between the punishment that they impose and the harm to the plaintiff. Is that the law in Nevada, that they have to be instructed on proportionality as part of the charge? Quite the contrary, Your Honor. The Nevada Supreme Court prior to State Farm had said that proportionality, reasonable relationship is something that was not to be considered by the jury. Not to be considered. Exactly. Or not to be considered at all, even in review of a punitive damages award. And that was in the Ainsworth case. And, in fact, that's the crucial point. State Farm has obviously overruled Ainsworth on that question. So now the question is, if we're going to look at Nevada law, would the Nevada Supreme Court, now knowing that it's a constitutional matter, it must review any punitive damages award, take into account proportionality, would the Nevada Supreme Court agree that the juries ought to hear that? That's an appellate matter, isn't it? It's really not for the jury in the first instance to be so instructed. I'm not clear about that. No, Your Honor. The point that I was trying to make in response to Judge Kuczynski is exactly that. It literally makes – it's illogical. And, in fact, I'll go further. It's perverse to say we're going to review a punitive damages award for propriety, for constitutionality, on the basis of these rules. But, by the way, we're not going to tell the jury that they ought to consider those factors at all. And, in fact, going further, what happened in this case, we're not even going to let the crucial piece of evidence go before the jury. We're not going to let the jury hear that factor so that if the jury happens to come to that on its own or if some member of the jury happens to realize that that's a basic principle, both of retribution and deterrence, it will be fortuitous. That cannot be what due process is. What is the proportionality regime that the jury would be given then? Reasonable. Reasonable. That's all that had to be told, that there was a $2 million comp and that it has to be reasonably proportional. Reasonably proportional. Exactly. Mr. Williams. Sorry. Yes, Your Honor. I'm sorry. I didn't mean to cut off your answer. I think it's important to make clear that what we're saying is reasonable proportionality to the harm caused to the plaintiff. And we recognize that in TXO, for example, that the Supreme Court said that one should take into account, in the appropriate cases, not only the actual harm to the plaintiff or, as the Supreme Court in State Farm said, the general damages, but also potential harm to the plaintiff, where that's relevant. Here, it was a fatality, so there was no other additional potential harm, which is why we didn't ask for that. And just to be clear, and then I'll defer to Judge Kuczynski, this is all derived from State Farm. Yes, Your Honor. That's fine. Thank you. Well, let me ask you, let me see if I can just refresh it a little bit, because it seems to me the question as to whether this is a jury instruction issue or merely an appellate review issue is pretty fundamental to State Farm. You know, we happen to have a peculiar case that probably seldom arises. We have to sort of re-man the punitive damages, and the question is, does the jury have a baseline from which to do a proportionality analysis? So that's a little unusual about this case, but I take it what you are saying is that it is an abuse of discretion in your normal punitive damages case now, anywhere in the United States, for a judge not to instruct on proportionality. I am saying that, Your Honor, but I want to be very clear on something, because I'm not sure if there's an implication in Your Honor's question. I am saying that, that in the future it would be an abuse of discretion, but I'm saying that in reviewing this issue today, that this is a question of law for this court, and that this is not an abuse of discretion question. We are entitled to this as a matter of law. So this is a de novo issue, a de novo review on this question by this court. And I should say one more thing. I don't know if that helps you very much, because if in fact State Farm requires the judge to be instructed on proportionality, and the district judge doesn't do it, then it's abuse of discretion, because failure to follow the law is an abuse of discretion. Now, even if it were not required as a matter of law, it could be an abuse of discretion because of other considerations. But if you were to give up on those other possibilities, that's fine. All you've done is sort of narrowed the ways in which the district judge could be wrong. That's your choice. I'm not giving up on it, Your Honor. I just wanted to be clear on that point. Well, if it's an abuse of discretion, it could be an abuse of discretion because it's an error of law. It could be an abuse of discretion because it falls outside of whatever a reasonable jurist would do. Yes. And I was giving you the benefits of a broader standard. But if you want to sort of give more definition of this to the court, it's okay with me. But it doesn't really matter for purposes of my question. And that is, I find State Farm unclear on this point. I'm sorry, Your Honor. I find State Farm unclear on this point. Maybe there are things you can point out to me in State Farm on this question, whether it's a jurisdiction question or simply an appellate review question. But assuming there's nothing conclusive in State Farm, what have other circuits said? What have State Supreme Courts said? What is your best sort of set of cases or case of cases on this very issue? Is this a jurisdiction question or is this an appellate review question? The closest case, Your Honor, that I'm aware of is the Levinson case in the Third Circuit. And I readily agree that when the court in the Third Circuit addressed that question, it was addressing it as a matter of state law under New Jersey law. But the court then added a statement that it would make no sense to not have the jury be told about the reasonable relationship. And, by the way, that goes to what is essentially a second question, which is not only should the jury have heard compensatory damages, but it also should have been instructed that it should find a reasonable relationship in order that it should have received that instruction. And the Levinson case goes to that. I think that you also agree that the jury should be told, if you think such an instruction is warranted, about all of the aspects that enter into the concept of reasonableness, necessarily whether the harm was physical or economic, the tortious conduct, and all those other factors that are set forth in State Farm. That would be the complete instruction that you think would be warranted? Warranted, but not constitutionally required, Your Honor. Again, those could all be matters for argument by counsel as to what goes into the concept of reasonableness. But how can you suggest to the jury that they just hear a conclusory statement that it has to be reasonable without giving them some, as a district court judge, better guidelines to assess what constitutes reasonableness? It seems to me that you just want one part of that without giving the jury the full opportunity to understand all the aspects that enter into the concept of reasonableness. No, I'm sorry. I might not have been clear, Your Honor. I would be quite comfortable having the jury instructed on factors that go into reasonableness or that it should consider or may consider in connection with reasonableness. But today, all we need to decide is whether the jury must at least be told first, just told the amount of compensatory damages, and then second, and this is a separate question, whether it should receive an instruction about a reasonable relationship. You're asking for both, but I see there's only five minutes to go, and perhaps with the permission of my colleagues I can move you on to another issue. Let's assume that the jury knew about the compensatory award, and of course it's unique here because of the nature of this case coming back on remand. The first jury obviously knew about it and came down with an award somewhat similar to the second jury. But I'm just curious in terms of assessing the issue of 10 to 1 or 20 to 1 or 30 to 1, whether you can just educate me about a few things. I take it that all of the harm here was basically physical and very little was economic, maybe funeral bills. Is that correct? That's correct, Your Honor. All right. That is the most important factor once we get into analyzing the issue of proportionality, and it seems like State Farm, these other cases, none of them really track a situation such as we have here where all of the harm really was physical, four-year-old boy, you know, dying. Don't you think that that in and of itself would warrant an award that could exceed the so-called 10 to 1 or 9 to 1 or 1 to 1, whatever those formulations are, just that factor alone? Absolutely not, Your Honor. In fact, the Supreme Court in State Farm set out a three-part analysis of the types of ratios that are allowed in Planned Parenthood. This court confirmed that and, in fact, applied it really quite rigidly, namely where there is substantial compensatory damages, even where there is high reprehensibility, the limit is 9 to 1. The instance when a ratio above 9 to 1 is permitted is where there is insignificant compensatory damages. If this person was a 40-year-old person with five children and a lot of economic harm, it may well be that a $15 million compensatory award would be appropriate in such a situation. In that case, would you agree that the $52 million punitive damages would be indicated and would not, you know, violate 10 to 1 or 9 to 1? If you had a $15 million compensatory award, that would be within the guidelines. In fact, within, I would say, the requirements established by Planned Parenthood based on State Farm. But you'll hear, you see, you have a situation where you have no economic injury at all. But if you had economic injury, then you think that this award would be okay. So a 40-year-old put to death would fall into a different category than a 4-year-old put to death. That's exactly right, Your Honor. It's fairly reasonable. Yes, Your Honor, it is because of the amount that's involved, because of the high level of compensatory damages that's involved. And that is exactly what State Farm says. That's what Planned Parenthood says. That's what this Court has said. So your client gets some sort of a windfall because it was a 4-year-old that was put to death rather than a 40-year-old who was seriously maimed with a large economic, you know, compensatory award. No, Your Honor. It's not a question of a windfall. It's a question of what the proportionality is that's required by the Constitution. May I ask another question? I believe I read someplace that Ford saved about $200 million by not doing what arguably he should have done. And now the pin of damage is $50 million. It looks as if they really cannot deal with the bargain in that way. I don't think that premise is right, Your Honor, about saving $200 million. I'm not sure where that would come from. The total cost of the recall was $22 million. And, in fact, we went into great length, and I could with more time, explain to the Court why the evidence shows that even that amount, that it was only a delay of the recall that was involved here, and a very far, far, far smaller number than that was accounted for by the delay. May I reserve my time? No. Actually, we'll give you a little more time. I'm sorry? We'll give you a little more time for a bottle, but I had a couple of other questions on other aspects of the case. And we'll give the other side more time, too, because there's a lot to explore here. Getting past this issue, the principle issue we have been discussing, the principle issue we've been discussing, as to whether the jury needed to be told about the damage award, they needed to be told about instructing for pushdown. Getting past that, assuming there is such a requirement, you also, there were some other things that you argued in brief the jury should have been instructed on. The one that immediately comes to mind is the 40% fraud assessed on the plaintiffs. And I am not sure I quite followed that. So I'm now assuming that we accepted your argument that some sort of instruction had to be given to the jury as to the amount of damages. And I'm not saying that's what we're going to do, obviously, but just so we can get into that part of the discussion. Assuming we buy that argument that they needed to be told what the damage award was and they did need to be instructed to put questionality, I'm still not sure I follow why they needed to be told about the comparative fraud of the fatality fraud of the plaintiffs. I just have to make sure I understand the court's question. First of all, I think the court knows that the compensatory award paid by Ford, actually paid by Ford, was the full compensatory damages. Well, that's part of my reason for asking the question. Right. So the plaintiffs were assessed 40% of the fraud, but their damage award was not reduced by 40% because of the way the ban on fraud works. Right. So what's the point of telling the jury, and why is it an amusing discussion to fail to tell the jury? Right. And the reason for telling the jury about the 40% comparative fault is twofold. First of all, it was one of our arguments to the jury, or was to be one of our arguments to the jury, that these events were very rare events, that it took an occurrence of several factors in order for these kinds of events to occur. And in this very case, the point was this would not have occurred had it not been for the negligence, substantial negligence, of the plaintiffs themselves in terms of how they treated the truck and where they left their child and the bizarre nature of this particular rollaway. Second, how much was the jury in this second case told about the circumstances of the accident? That's exactly the problem, Your Honor, in the preliminary instructions. What they were told was that they were told that there were findings by the first jury that were upheld by this court that Mr. White left the truck out there that Walter White somehow climbed into the three-and-a-half-year-old boy, somehow climbed into this F350 truck, that he somehow, that Mr. White left the truck in first gear, that the three-and-a-half-year-old boy knocked the truck down. I'm sorry, Mr. Ray. You probably, I probably didn't express myself as well as I should have. I understand what the district judge told the jury. I was wondering, was there any evidence taken on the circumstances of the accident itself? Was there any testimony or anything else, or was it limited to what the district judge said? It was limited to what the district judge said because he instructed the jury, the second jury, that they have to take these as true, over our objection. Okay, so there was no evidence, no testimony, nothing about the events on the day of the accident presented to the second jury. The entire record on that was what the district judge advised the jury. Correct. What we have on the record. Correct. Okay. Okay, we'll give you about five minutes for that. Could I just, so we don't sandbag the other side, could you just tell me quickly on the net worth issue what you believe? First of all, there was a stipulation, as I understand it, before the retrial. Yes. Was it the 2003 balance sheet could be used? No. Or was it 2002? No, it's the 2003, but the stipulation was not that it could be used. The stipulation was that if the district court overruled all of our objections, that evidence of the company's net worth would be the 2003, the number stating the 2003 balance sheet. Okay, and that balance sheet is what was presented to the jury? A redacted version over our objection was presented. The actual balance sheet showed both the 2003 number and the 2002 number, which was less than half of the 2003 number, and I explained to the district court that I thought I should be permitted to use that. They blacked out the, or took out the column that showed the year-to-year comparison? Correct. Okay, so that was, and your argument then is with that, was it $11 billion was the net shareholder's equity, that you ought to be permitted to do what with that number? Ought to be permitted to do several things. First of all, I should have been allowed to show what the 2002 net shareholder equity was, which it was part of the balance sheet. To be able to say to the jury, it's just, it is. Okay, so you would have no objection then if the 2002 column were in the exhibit and hadn't been redacted? No, that's just part of what I asked for. I also wanted the remainder of the financials to come in so that I could show the jury the other portions of the financials that explain why, again, just the single number of net shareholder equity. What would be the relevance? In other words, what were you trying to get at? That this somehow was an exceptional year and that the jury shouldn't look at Ford's net worth as of the time of trial? Well, that's exactly right. And by the way, Your Honor, the Nevada statute, what Judge Hagan did was his sole authority for the position he took, that the only relevant number was net worth, was what he said he learned when he was an undergraduate in college. Well, that's okay, but I'm trying to understand what you thought you were going to do with it. What kind of trial would it have been if your best case was going to be put before a jury? You were going to give them an accounting lesson on how Ford's finances globally fed into that number and try and limit it down to the truck division or whatever? Is that what you were trying to do? It wouldn't take an accounting lesson. I certainly wouldn't use that term in talking to the jury. No, I would simply want to show the jury the portions of the financials in the annual report. It says, look, Ford Motor Company derives its income from a lot of sources that have nothing to do with it. But so what? If the purpose of damages, the punitive damages, is to punish and to deter, what difference does it make whether they're looking at how Ford gets its money? The question is, what's going to give it a stangling that's going to get its attention? But the jury may well agree that what's appropriate deterrence and what's appropriate punishment depends, in part, on where that net worth comes from. I'm having a little trouble following that. If Ford has a high-risk venture that's a money loser, but it decides, like the Corvette, GM put out the Corvette and a lot of people are the Corvair, it's opposite ends of the spectrum. But because the company chairman had something to do with designing the car, they kept it out on the road even though it was a big hazard and it killed a lot of people. It's purely hypothetical. And it was a money loser. But they made billions of dollars on other collateral aspects of their work. Why wouldn't the jury be looking to what their net worth was, not what the profits or losses and the contribution to the bottom line were of this highly hazardous product? Let me start with, if I may, the Nevada statute, which says financial condition. It does not say net worth. So why would the Nevada legislature say financial condition? Here's one of probably a dozen reasons I can give you. Suppose that as of 2004, in each of the prior three years or four years, that Ford's net worth had declined by one half for one reason or another. It started at $100, then it was $50, then it was $25, and then it was $12.5. Just suppose, hypothetically, that's the case. And the same factors that had been causing Ford to lose billions of dollars every year for three or four years in a row were still in place, for example, pension plans and unfunded pension plans and so forth. That obviously would be telling the jury, this company is in serious financial trouble. The fact that today it has a net worth of $11.3 billion does not describe the company's financial condition at all. It describes one snapshot of something called net worth. And as Judge Posner and Judge Easterbrook have both said in separate opinions, that is an accounting artifact. In fact, there would be a perverse inducement on the part of this kind of a ruling, which is that it would say to any company that has a big trial coming up, you better pay out a big dividend this year because if you pay out a big dividend, your net shareholder equity at the time of the trial is going to be a lot lower and the jury will then have a lower number on which to base punitive damages. I think I have that point then. Okay, thank you. Thank you. Good morning, Your Honors. My name is Shannon Spector from Kline and Spector in Philadelphia. Let me begin, if I may, Judge Fischer, with the last question that you asked to try to get some context to what occurred in the trial. We did have a stipulation that it would be permissible for us to use the consolidated balance sheet from 2003 in the event that Judge Hagan ruled that financial information was admissible in the trial. We used this document, which is P218, on that subject, which was the balance sheet. Toward the bottom, it lists Ford's shareholder equity as $11.6 billion. I do not believe anything was redacted. What occurred was that – The balance sheet, consolidated balance sheet that was produced by Ford in the form that is without a December 31, 2002, comparative column? Judge Fischer, that's my memory, but I do not want to swear to the court that – I do not want to swear to the court that 2002 was not redacted, as Mr. Wheeler said. I asked my colleague to get me a copy of the exhibit, and I've shown it to the court by way of displaying it. I do not see anything redacted. I do not recall anything being redacted. But in any event, the real objection from Ford is not that there was a redaction here if there was one. Their real objection is that they weren't allowed to put into evidence their annual report and argue from that. And let me provide the context for what happened there. This was a retrial limited to punitive damage amount. There were three witnesses who testified. They were all engineers. We called two Ford engineers, and Ford called an engineer from the manufacturer of the component part to break. There was nobody who came in and testified about Ford's financial condition. Ford could have called someone if they had chosen to. As the last act in their presentation of evidence, Mr. Wheeler sought to introduce the annual report, and I asked for an offer of proof as to what he intended to do with that introduction of that bare document, and he told the court that he wished to argue from it about the matters that he's described to you today and other matters as well, such as the fact that Ford's lack of profits was due to currency fluctuations and the like. Well, that would be fine if there were someone who came into court and testified about those subjects, and I would not have objected if he had brought someone into court to talk about Ford's financial condition, even though it's clear from the law of this circuit, the Howard case, that net worth information is supposed to be the information that's provided, and most of us look at shareholder equity as what constitutes net worth. And it's also clear under TXO, the U.S. Supreme Court case, that net worth information is that which is usually provided in a punitive damages case. But frankly, if he wanted to have somebody come in from Ford, somebody from the treasurer's office, for example, to talk about that subject, I would not have objected because I don't want to try this case a third time on that issue, or, by the way, on any other issues that have been raised by Ford in this appeal. These are not issues about which a case should be tried for a third time, any of them, any of them. But he didn't choose to do that. What he wanted to do was to have a lawyer's argument, which I can't cross-examine that, Your Honor. Okay. Let me go back, if I could. Thank you, sir. Let me go back, if I could, to the beginning of counsel's argument very quickly and deal with the arguments. First of all, the first thing counsel told you was that the Supreme Court has told us that a jury must be told the amount that a prior jury has awarded in compensatory damages. There's no case that says that, no case at all that says that. This may be the case. Well, Your Honor, it could be the case if Your Honor and your colleagues choose to say so. But let's go back, if we could, to first principles about why it is that we're talking about reasonable relationship in the first place. It all comes out of Gore to begin with. And the idea in Gore was, Gore said there are three guideposts in looking at what's the proper punitive amount. The first and most important guidepost is the reprehensibility of the defendant's conduct. We've spent no time at all talking about that today, and perhaps we need not. I've heard no questions on that subject. But the conduct here in this particular case is reprehensible to the highest degree. Planned Parenthood, which is the most complete analysis of the cases in this circuit to date, talked about. Oh, I don't know. This is not a jury. You know, we don't have a jury here. You know, we... I will dispense with that. Please. Judge, I will dispense with that. Spare us. The fact of the matter is that the Supreme Court in all of its decisions dealt with a normal case where the jury assessing punitive damages is also the jury that assesses actual damage. So we really have no reason to presuppose a case where the jury doesn't know. I agree, Judge Kuczynski. My only point is that State Farm does not hold... Finish my question. I'm sorry, sir. I think we're agreeing. I mean, I think you're just saying... If you listen to my questions to Mr. Wheeler, you'll see we agree. I don't think that State Farm requires it one way or the other. We have to look at the Supreme Court case, including State Farm, and figure out what the Supreme Court would have thought had it been confronted with a situation like ours. It wasn't. It presupposed a jury that knew. It certainly did not say anything like the jury must be told to put out of its mind the amount of actual damages it assesses in making... So we're talking about making an assessment of punitive damages. So what the Supreme Court was saying is, was speaking of proportionality in the context of a situation where inherently the person or the entity making the decision as to proportionality knows what the baseline is as to damages. We have to figure out where that premise is missing, whether it has to be supplied. And, you know, it strikes me, at least Mr. Wheeler's argument makes some sense to me, that you can't really be talking about, if the jury is to perform this function, that you really can't talk about it without... It can't even begin to perform that function without knowing what the baseline is. Sure, you can add repressibility, you can add net worth, you can add a lot of other things, but if this is the benchmark, if this is the anchor, I have a hard time understanding how the jury can do that, perform that function. Your Honor, this circuit... I'm sorry, Your Honor. Thank you. This circuit has addressed this issue squarely. In the Haleo case, H-I-L-A-O, this circuit decided that no reasonable relationship charge is constitutionally required. Judge Hagen relied upon this circuit. It is charged to the jury. So I believe that that issue has been dealt with by this circuit. In addition, the U.S. Supreme Court, in the Haslip case, approved a jury instruction that did not contain a reasonable relationship charge. So, again, we don't have to go over to New Jersey... Haleo was pre-State Farm. Haleo doesn't help here any. You can't read the tea leaves as to what State Farm means by looking at a case pre-State Farm. Let's be serious. Your Honor, the reasonable relationship concept really comes out of Gore. That's really where it comes from. And what it's rooted, sir, in is the idea that a defendant should have some sense as to that for which it may be held to answer by way of a punitive damages award. Was Haleo applying Gore? Haleo? I don't remember off the top of my head. My colleague will answer that question for me in just a moment. But if I can come back, sir, to the jurisprudential basis to begin with. Why do we need to provide fair notice? I think that's an important concept. But for a company that manufactures motor vehicles in the United States, such as Ford, they've known for decades that they may be held liable for a very large punitive damage amount if they behave very, very badly because they have seen themselves and their colleague motor vehicle manufacturers be subjected to very large punitive damage awards in isolated cases across the country where the behavior has been very bad. So they've been on notice of this for a very, very long time. And the idea that they don't know that they could be held liable for 22 to 1 or 16 to 1, depending upon how you look at this case, is just not sensible. To answer the court's question, Gore was May of 96 and Haleo was December of 96. Sorry to have been in your opinion. Yes, sir. Thank you, sir. No, but that's not the question I asked. The question I asked is whether the portion of Haleo that you cited relied on Gore. Or, you know, the fact that you had a case out there that somehow dealt with partiality, and then it had a subsequent case that said something doesn't mean that it was, in fact, interpreting Gore on this issue. State farm is the key case. And, you know, you somehow have to tell us that, oh, well, we can look at pre-state farm cases because they already considered the issue in light of prior Supreme Court precedent. I have Flair here. I don't know if I can look it up. I don't know what the answer is to the question. But the fact that that. Your Honor, let's suppose for a second that the jury had been told that it was a $0.3 million award to compensate the wife for the death of their son. Are we to presuppose that this jury would have thought that the first jury had not followed the instruction from the first trial that their award to compensate should be to compensate only and not to punish? And if we would have presupposed that the second jury would have thought there was some element of punishment in the first award for $2.3 million, how could they know what that was? We had no evidence in the second trial about the emotional distress of Mr. White. But State Farm talks about proportionality. It says proportionality is substantially a function of damages. I just don't know how the jury can perform that function without knowing what the baseline is. State Farm references Gore and says that proportionality is a concept that's important in assessing fair notice to the defendant of that for which it may be liable. And my overarching point on fair notice is that this is not a company that has some isolated exposure to punitive damages. They know they may be held liable for punitive damages. They've known that for decades and decades. So the idea that this particular defendant does not know they can be held liable for 10 or 20 to 1, I think just does not hold water. You're arguing basically that it's totally irrelevant before a jury as to what a compensatory damage award was, whether it's $2 million, $15 million, $50 million. That's really nothing for the jury to be concerned about. And when they assess punitive damages, they do so under the so-called Gore factors. But that doesn't necessarily mean that they have to know what the compensatory damages are. That's basically your argument in a nutshell, isn't it? Yes, it is, sir. And I get a clarification in response to that answer. You mentioned that the jury was instructed that the first jury had been instructed that compensation was for compensation. Compensatory was to compensate, not to punish. No. What the second jury was told is that the whites had already been fully and fairly compensated. The second jury was not told in any direction whether or not compensatory damages functioned to compensate, not to punish or deter. That is correct, Your Honor. They were not instructed at all on that subject. And my only point is that we should assume that the first jury, since the case essentially was bifurcated, they didn't consider damages to punish until a second phase, that they were following the court's instructions and compensating only in their first award. Our argument is that we would have to assume that the first jury in awarding compensatory damages followed the instruction and there was no punitive amount included in it. We should not presuppose that the first jury did not follow their instructions. That's my narrow point. But even if you do, I still haven't heard the answer to the question of how, if the jury should perform some sort of proportionality analysis. And maybe your answer is the jury doesn't do it. It's all a question of political view, how it can do it without knowing what the actual damages were. Your Honor, my answer is simply this. It is not constitutionally required that a jury be told of the amount to compensate. No court has said that above this court. No en banc court of this court has said it. No panel of this court has said it. Haleo says no. Why does Haleo say no? Haleo says that a reasonable relationship charge is not constitutionally required. Tell me when, Haleo. Tell me exactly what you did with Haleo. 17.782, Your Honor. I said the number. It says half of them, not Gore. That's correct. As far as we can tell. But I would assume that a panel of this court would have known about the decision in Gore and would have taken it into account, Your Honor. It's talking about Gore. I don't think that's the issue. I mean, Gore is cited right before it. There's no doubt that the panel is confronting Gore. They don't cite Gore for the proposition that you're relying on them, or does it? Well, I mean, you have to have the argument made to the panel, to the court, in order for it to be disposed of. What you want to say is we can look back beyond State Farm because it's Gore, and then we have this opinion from our court that doesn't address this argument, but they must have somehow implicitly decided it, which is then binding on us after State Farm, because they must have understood this argument to be on the table and decided it. I mean, this is very convoluted stuff. Well, we start with the first principle that in order for Ford to prevail on this issue, they have to satisfy this court that Judge Hagan abused his discretion in not charging the jury on this subject. We do understand that, but you must also understand, even if you won't sort of come out and admit it, there are two states of being. There are, you know, we are bound by a prior case to ruling a favor, or the field is open, in which case we have to decide and make the law in there. And what you want to do is to say this has been decided by our prior case. We are bound. Even if we were to agree or favor us with Mr. Wheeler, we have no discretion to do it because the earlier panel of this court has resolved the issue. If you were right on that, then you would win, and that would be the end of the matter. The problem is this earlier case, which you are relying on, has been, there have been Supreme Court cases since then that seem to very strongly support Mr. Wheeler's position, and insofar as they are telling, they would supersede anything that was said in Haleo. So your answer back to us, this is a ping-pong match, right, is, oh, but Haleo is still good law because it relied on Gore, which said the same thing as State Farm. So that feel over the net is, but they didn't confront this argument, and they didn't take into account Gore in resolving this issue, so you can't really say it's binding on us in light of buying the Supreme Court president. You know, I think what it looks like to me, what we get back to, is you have to persuade us that State Farm doesn't require this. Judge Kaczynski, that's exactly the point. At bottom, State Farm does not require it. If I could just finish my thought. We have no binding authority on this. No, I don't agree, sir. No, I don't agree on that, sir. Let's talk about that. Okay, if I may, I want to take the last thing you said first. It might be useful just to look at the opinion because the opinion is an exegesis on Gore, so you may want to look at your opinion before freelancing on the – I have it here, Judge. Okay, thank you. I have it. I'm not freelancing, sir, I promise. All right. I want to start with by saying, Judge Kaczynski, State Farm does not require that charge. State Farm takes us nowhere past Gore on the subject of a reasonable relationship charge or reasonable relationship at all to begin with. It simply refers back to Gore on that subject. On the issue, Judge Fischer, that you just raised, that I'm not freelancing, let me read the language to the court, if I may, because I think it's instructed on the subject. It appears at 781 at the bottom, and the court says, indeed, while the estate complains that its rights were violated because the jury was not instructed that a reasonable relationship must exist between the amount of compensatory and exemplary damages, the actual instructions approved by the Supreme Court in Hazlitt contain no such explanation. Right. Since then, we have State Farm that seems to say that explanation is required. So in the trial in Hillel, we looked at an earlier Supreme Court case couldn't have taken into account the later Supreme Court case. It didn't take into account Gore, the case you want to consider. But, Judge Kaczynski, State Farm doesn't say that respectfully. We can talk about what it says or not, but you understand we're deciding the question of whether we are bound by Hillel. You want to say we're bound, we don't have any discretion because it's resolved the question. But, as you know, under Miller v. Gammey, also in that case, if there's superseding Supreme Court authority, then we're not bound. It looks to me like what's going on here is that they were interpreting Hazlitt, and Hazlitt had no such requirement. So the Supreme Court comes along later and imposes such a requirement, we're not bound. So we're back to deciding whether or not State Farm imposes such a requirement. And I suppose what I kind of come back to trying to help Mr. White and his family in this case is the question of whether the court is going to decide. A little aside for the jury? Just pointing out that I'm the attorney for the plaintiff, Pelley, Your Honor. Are you going to help him out enough to give up part of your fee back to him? I don't think so, so let's not go there. But in any event, so I understand. The Gore factors ought to be charged to a jury on punitive damage issues, but not necessarily the issue of relatedness or proportionality. That's really an appellate matter for review. That's basically what your position is. Yes. And you're saying that State Farm, there's nothing in State Farm that commands a district court judge to charge a jury on the issue of relatedness. Yes, that's correct. If I may, with the remaining time that I have, make one other point as to what was argued by defense counsel, and that is that he has argued that Planned Parenthood says that the nine-to-one ratio is the maximum that may be permitted except where the economic harm is insignificant. And nowhere does Planned Parenthood say that. That is just not in the case. Planned Parenthood involved a case where this circuit said that the reprehensibility did not fall at the highest rung. So if this court determines, as the district court did below, that this case involves reprehensibility at the highest rung, then it seems to me clear that a greater than nine-to-one ratio would be permitted and advised. There are surely far worse things than this. I'm sorry, Your Honor. I didn't mean that. There are surely far worse things than this, and we've all seen them. But, you know, I guess I'm having a great deal of difficulty understanding what is to be gained by hiding this important fact from the jury. You know, they're not allowed to, because of the way the remand happened, they are not allowed, you know, they're not there, they can't hear the evidence about what happened. They don't know anything about the fact that the earlier jury found the plaintiffs 40% at fault in this whole matter. And they're not even told what the earlier jury, they're not allowed to make their own assessment of damages, because they're not given any evidence as to what the damages are. There's no testimony on it, there's no cross-examination, anything of that sort. So they can't make their own assessments of damages, and they're not told what the jury that did have that evidence, what assessment it made as to damages. I just find that, you know, this sort of blinding the jury, and then expecting it to make some sort of dissemination of this Constitution permissible, I find this very, well, what's the sense behind it? I mean, you must have argued in this court that that's what should happen. I'm just having a hard time understanding how you managed to persuade them to do that. Your Honor, the whites prevailed on three claims in the district court. They prevailed on a negligence claim for which their award could be reduced by comparative fault. They prevailed on a failure to warn claim, which is a product liability claim, that under Nevada law and the laws of most states, you do not reduce for comparative fault. And they prevailed on a claim of intentional misrepresentation. And you don't reduce for that award either. So if I could just say... We're talking about the apprehensibility of conduct here. And it seems to me that the fact that in order for this accident to have happened, your clients have to bear substantial fault is something that jurors ought to be aware of. They certainly ought to be aware of what it is that the earlier jury thought were the actual damages in this case. Your Honor, Mr. Wheeler could have made the argument or could have introduced evidence through his engineers if he had been chosen, just as he said here to this court, that this kind of an accident could only happen through a bizarre combination of circumstances that would involve some conduct on the part of the driver or someone in the driver's family or a bystander or what have you. As a matter of fact, Your Honor... Would that have told them what the damages were in the earlier case? I missed the first part. Would that have told the jury what the damages were in the earlier case? The damages? The damages were the death of a child. They knew that. No, they're not the damages. No, that would not have. But I'm dealing with your point to me. What is the point of keeping the jury in the dark about something that every other jury that may complain that the damage is aware of? The jury was not kept in the dark, Your Honor. The jury was told that which a panel of this court in this room told all of us a year earlier as to what the operative facts were of the accident. The jury was told that. The jury was told that the whites were fully and fairly compensated. Are you saying that in the earlier case we said don't tell them how much the damages were? This court did not say what the jury should not be told. This court said what the facts were, and from that, Judge Hagan inferred what the jury should be told. If I may come back for one moment to the argument about bizarre circumstances, what the evidence showed was, to the contrary, that this kind of thing happens all the time. There were 1,149 rollaways before reported to the government as of June of 1998, causing 54 deaths, 54 injuries, and Walter White death. So what the evidence showed was that this could happen not through some bizarre set of circumstances. 800,000 vehicles out there nationwide. Were these numbers that you just cited to me, were they nationwide or in Nevada? Nationwide, Your Honor. Okay. But we were told that the jury couldn't consider nationwide. That's not what this panel said. The court said that they could consider out-of-state conduct as it bears on reprehensibility, but they could not consider out-of-state conduct as to harms to other people with respect to the amount of damages that they imposed. And the charge of the court below on this subject read straight out of what a panel of this court said it should say on that issue of extraterritoriality, that out-of-state conduct was relevant on reprehensibility, but not as to the specific amount of damages should not be imposed to protect people in other states or other places. What is getting to the amount that is actually awarded? What case comes close on the facts here that would justify going above what at least Planned Parenthood seems to suggest is a sort of line of around 10 to 1 or thereabouts? Judge Graber, when she applied, it came out with that. What's your response to under whatever analysis that gets you up to 22 to 1? Thank you for the question, Your Honor. My answer is no. I'm looking for an answer. I wasn't. Okay. I would say look at the Williams case out of the Oregon Supreme Court a couple of months ago, which approved a ratio of 100 to 1 or 159 to 1, depending upon how you do the math on the award to compensate, in a tobacco death case. Look at the California Intermediate Court of Appeals just in April of this year in the Bullitt case, which I handed up to the court officer before we started today for Your Honor's considerations, which approved 33 to 1 also in the cigarette case. And in the cigarette cases, it does. How does the conduct here compare with Ford's conduct in this case? In this case, you have a failure to warn, which is really what the jury is focused in on, whereas in a tobacco case, it's fairly notorious that there was a prolonged period of conduct that has been litigated all across the country. So how does – if that gets you to 30 to 1, how do you rank Ford's conduct here on that kind of a scale? The conduct here – It's all turning on me. The conduct here – Let me just – I'm sorry. I'll tell you what's bothering me. I mean, it's a very unfortunate, tragic, terrible event, and the jury made findings also with respect to the intentional nature of the failure to warn. But you have a single incident which, as Judge Kuczynski has pointed out, the plaintiff was contributorily negligent to the parents' name. And, of course, that may be said, too, about the tobacco cases. I'm not sure the smokers are contributorily negligent. But trying to equate a ratio – in other words, if this case is now put on the board of ratio analysis, how does this get there compared or contrasted with tobacco cases on a single – because of the fortuity of a child being run over by this runaway vehicle? Your Honor, in comparing the conduct, the conduct of Ford is worse in some regards and it's better in some regards. It's worse in the regard that this problem still exists today because the actual problem has not been warned of. Rollaway has not been warned of ever, despite the fact that Ford's engineer testified in this trial that – There's a regulatory agency out there that hasn't required them to. And they have failed, Your Honor. Well, okay. But that's a – What is the other point of distinction? Pardon me? What other point of distinction? I'm sorry, just go ahead. What other point of distinction? You said there were some cases better, some cases worse. Well, I think on – to Ford's credit, if you want to call it credit, I think that there obviously were fewer people that were killed and injured as a result of the conduct. So I think that you would look at that also in terms of looking at the overall harm, although then we sort of run into this harms to other people in other places, which may not be permissible to consider. But it seems to me that if in Planned Parenthood, Your Honor, the Ninth Circuit decided that nine to one was fair, where no one was injured and no one was killed, then you look over here at this case and you say someone was killed and other people were injured, and in terms of reprehensibility a higher award is justified. The fact is that the Ninth Circuit, just like the U.S. Supreme Court, has not yet considered in a post-state farm context what is the permissible outer bound of punitive damage ratio in a case involving a physical harm or a death. All the Ninth Circuit cases, the whole line that we have post-state farm, involves an economic harm or a threat in Planned Parenthood, but no actual physical harm. The U.S. Supreme Court in their whole line of cases, going back to Haslip and TXO and Oberg versus Honda, all those cases, Gore, state farm, they all involve economic harms. So we haven't confronted squarely, and this is an excellent opportunity for this court to confront squarely the issue of whether there is meaning to what state farm says. When state farms said that few cases involving a greater than single digit ratio to a significant degree will withstand constitutional scrutiny, what they're saying, put it in the reverse language, is some cases will. So the question is, what cases will? What are those cases? And we maintain respectfully that this case is one of those cases that permits such an award without infringing on constitutional rights for a motor company. So let me understand. We consider all the Gore factors as an appellate court. I think we can accept that, correct, in reviewing the award, correct? Yes. And we have to consider, of course, the compensatory damages because we're told that we must consider that on the issue of ratio. But the jury considers all the Gore factors but does not know about compensatory damages at all. So there's a sort of disconnect in that respect. There's one other difference. There's one other difference, and that is the jury looks at all the facts put in front of them by both sides and decides which side is more right than wrong. On the other hand, this panel must draw all reasonable inference. But it's not given all the facts because it's not allowed to assess actual damages. It doesn't give any of the facts which would allow it to assess actual damages. And it's not told what the jury that did assess actual damages made. So I don't know how you can say that it was given all the facts. If I could just finish my thought, this court is to draw all reasonable inferences in favor of the verdict winner so that we do have a different standard of review in this court than the jury below would apply to their own decision. Basically, the jury is not to consider the amount of money awarded for compensatory damages, but we must in applying this ratio concept. Correct. And that's a matter of constitutional significance. In a sense, sort of give you to appellate review is what you're saying. Yes, sir. I thank the court. Okay, thank you. We will give you four minutes. May I pose a question to you first? I know it's probably not what you prefer, but if you can indulge me. I personally am a little bit out of sorts with the concept of ratio and proportionality. I know we read all these cases and we try to line up this one with that one and try to find out where this comes out. It seems to be a rather subjective, arbitrary process that is imposed upon us as an appellate court. But let's assume that there's very little compensatory damages for a four-year-old. I don't know where the 2.3 comes from. I know in the New York law that the life of a child is not, you know, we don't value that. It's all economic harm. So I don't know where the 2.3 million comes from. But let's assume that it was just $50,000, that it's a four-year-old, we don't have any economic harm here whatsoever, and it's all just unfortunately basically a very small award. Are you saying in that situation that maybe punitive damages of $500 or $5,000 is all that would be indicated because we applied some sort of a ratio concept there? No, Your Honor. There are two responses, two very important responses to Your Honor's question. First of all, the exception that is provided in the three-part analysis, both of Planned Parenthood and of State Farm itself, says that where the compensatory damages are not significant, and $35,000 is one case in which that was considered not significant, that a number, a ratio beyond 9 to 1 would be permissible. And that number, by the way, as we see in the racial discrimination cases, for example, may be as high as 28 to 1. But I think the second really important response, Your Honor, goes back to your ñ I know the displeasure you expressed when I was up here on my opening argument about the seeming unfairness of a different number for a 45-year-old person who dies and has large economic damages. Remember, Your Honor, this is punitive damages we're talking about. We're not talking about ñ and you used the word windfall. The cases are legion where punitive damages are referred to as a windfall to the plaintiff. Punitive damages are for society. The fact that the award in a particular case is large or small is not a question of fairness to that plaintiff. It's a question of what is necessary for punitive damages to meet the needs of society. But you seem to ñ by saying that, it seems to me that you're arguing that we should not really be hung up on compensatory damage awards at all because they really have nothing to do conceptually with the concept of punitive damages. So all of these variables, whether it's economic harm or physical harm, whether it's a 40-year-old or a 4-year-old, really seems to be arbitrary stuff that we should really place a very minimal type of a significance attached to it. Again, two points. One, to the extent that it is arbitrary, and I'm going to explain in a moment why it's not, the Supreme Court and Planned Parenthood impose that structure on this Court. But the reason it's not arbitrary is the compensatory damages, as the Supreme Court said in Memphis, and as all the economists agree, and many courts agree, every dollar of compensatory damages does, in fact, impose deterrence, and it's a punishment. You're taking it away from the defendant and giving it to someone else. So the point is how much more deterrence and punishment than the compensatory damages is needed. And that ratio is the question. It doesn't make any sense in light of your premise that punitive damages are to compensate society in order to deter the defendant. If the child is only worth an economic harm, $50,000, then it seems to me your premise argues for ignoring basically any ratio of 10 to 1 and going to what is necessary to get Ford's attention to not kill the 45-year-old or a bunch of children who are only worth $50,000. If the law, no, Your Honor, because the law does not limit compensatory damages to economic harm. And in this very case, as we know, there was very little economic harm to the named plaintiff's Mr. and Mrs. White, and they got an award in excess of $2 million for the non-economic harm. The law provides for that. If we talked about 150 years ago, I would agree with Your Honor, where there were limitations. This was for emotional distress, right? I'm sorry? They each got over a million for emotional distress. Yes, exactly. I don't think I've seen an economic harm case in a long time where there wasn't some element of psychic harm. And that's one of the very important changes in punitive damages law since it first arose a couple hundred years ago. It originally arose because the compensatory damages that were permitted were very, very limited. I understand. I was reacting to your answer to the hypothetical. I see. One minor point, if I may have another minute. Exhibit D567, which is at ER 305, is the balance sheet that contains both the 2003 and 2002, from which the plaintiff's redacted the column for 2002. I think it is worth bringing to the Court's attention, and it's in our brief, but I want to really emphasize there's probably the best evidence that the VADA itself considered that it was important for the jury to know compensatory damages is the punitive damages statute, 42.005.3, says that the punitive damages must be assessed by the same trier of fact, and that trier of fact must make findings by that statute along with any other required findings. It would be impossible for the jury to make the finding of the punitive amount along with compensatory amount without knowing what the compensatory amount is. So just as a statutory matter, it's clear that that's what the Nevada legislature intended. And finally, may it please the Court. I have a second, finally. I'm sorry? Is it my second? May I have one more, finally? The reason State Farm is, in fact, dramatically different from Gore is that in Gore, the Court was talking about the three guidelines for appellate courts to use. But in State Farm, this is the language the Court used twice. The Court said at page 426, Courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered. And at page 428, the principles set forth in Gore must be implemented with care to ensure both reasonableness and proportionality. That's the first time the United States Supreme Court used the language that it must be ensured that proportionality to the general damages. And that is the law, as of today, that should have been applied to this case. Thank you. The case is now closed.
judges: Kozinski, Fisher, Block